# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

LUIS E. REYES,                          :
                                        :
                  Petitioner,           :
                                        :
        v.                              :        Civil Action No. 17-1264-LPS
                                        :
DANA METZGER, Warden, and               :
ATTORNEY GENERAL OF THE                 :
STATE OF DELAWARE,                      :
                                        :
                  Respondents.[1]       :

---

## MEMORANDUM OPINION

Luis E. Reyes.  *Pro se* Petitioner.

Maria T. Knoll, Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware.  Attorney for Respondents.

September 7, 2021
Wilmington, Delaware

---

[1]Warden Robert May replaced former Warden Dana Metzger, an original party to the case.  *See* Fed. R. Civ. P. 25(d).



**STARK, U.S. District Judge:**

## I.   INTRODUCTION

Pending before the Court is Petitioner Luis E. Reyes' ("Petitioner") Application for a Writ of

Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Petition").  (D.I. 3)  The State filed an Answer in

opposition.  (D.I. 14)  For the reasons discussed, the Court will dismiss the Petition.

## II.   BACKGROUND

As summarized by the Delaware Supreme Court on Petitioner's direct appeal, the facts

leading to his arrest and conviction are set forth below:

> [Petitioner], and his co-defendant, Luis Cabrera, were charged with
> the murders of Vaughn Rowe and Brandon Saunders.  The murders
> occurred on January 20, 1996.  The defendants were not arrested
> until 1999.  The cases were severed and the defendants were tried
> separately.  Cabrera went to trial first and was convicted, as charged,
> and sentenced to death.
>
> Early in the morning of January 21, 1996, the bodies of two teenagers
> were discovered by a passerby in a wooded section of Rockford Park
> in Wilmington.  The bodies of Vaughn Rowe and Brandon Saunders
> were in a shallow grave that was covered by a maroon bed sheet.
> Rowe and Saunders had, according to expert testimony, been killed
> about twelve to eighteen hours before their bodies were discovered.
>
> Both teens had been shot in the back of the head.  Rowe also had
> internal injuries to his spleen, liver and left kidney as well as facial
> lacerations.  The additional injuries suffered by Rowe were consistent
> with the repeated use of blunt force.  Some of the injuries were
> inflicted by a belt buckle.
>
> The police recovered several pieces of evidence at the scene including
> bullets, four small bags of marijuana found in the victim Rowe's
> clothes, and a watch Rowe was wearing that had a memory bank of
> telephone numbers.  The memory bank listed a telephone number
> that corresponded with the residence of Luis Cabrera's father.
>
> At the victim Saunders' home, the police also recovered a business
> card for "ISS Servicesystem, Inc."  Handwritten on the card was
> "434-6154 Big Lou."  Both Cabrera and [Petitioner] worked at ISS

and some people referred to Cabrera as "Big Louie" and [Petitioner] as "Little Louie."

In March 1996, the police learned that the bullet, which killed Vaughn Rowe, came from a 38-caliber gun. The bullet had certain identifiable markings on it. A year later, in March 1997, police were investigating the unrelated murder of a man named Fundador Otero, who was killed in January 1995. As part of that investigation, the police conducted two searches at Luis Cabrera's father's house. During that search, they found a 38-caliber pistol and a single maroon fitted bed sheet. When the 38-caliber pistol was test fired, the test bullet had markings almost identical to the bullet found in Vaughn Rowe's head.

On or about January 20, 1998, the police interviewed Roderick Sterling, an inmate at Gander Hill prison. Sterling advised the police that he had overheard [Petitioner] having conversations with Ivan Galindez, who was Sterling's cellmate. At the time of those conversations, [Petitioner] was also incarcerated at the Gander Hill prison, serving a twelve-year sentence for the Otero murder.

Sterling heard [Petitioner] admit to Galindez his involvement in the Saunders-Rowe double murder, along with a man named Luis Cabrera. Sterling testified that he had overheard [Petitioner] tell Galindez that Rowe and Saunders had "shorted" Cabrera on a marijuana deal. Sterling also stated that [Petitioner] said he beat someone with a belt in the basement of a house at "601 something." He also heard [Petitioner] say that a neighbor came down during the beating because there was so much noise coming from the basement.

Sterling heard [Petitioner] recount to Galindez how he and Cabrera decided to take the person they were beating from the basement to a park. The victim was transported in the trunk of a black BMW. [Petitioner] and Cabrera then picked up the second victim so that they could kill both of them at the same time. Sterling heard [Petitioner] say that once he and Cabrera picked up the second victim, they went to Canby Park. Arriving there, they made both of the victims lie on the softball field and shot them. The bodies were then taken to Rockford Park and left there.

At the time of the murders, Cabrera and [Petitioner] lived together at 610 W. 20th Street in a three-story house. Cabrera and [Petitioner] lived on the second floor. The tenant on the first floor was Donna Ashwell. Clavel Clamamont and Maribel Skjefte lived on the third floor.

2

Following Sterling's interview, the police located the female tenants of [Petitioner's] former apartment building, Donna Ashwell and Maribel Skjefte. Although they were interviewed two and a half years after the murders, the women remembered a fight in the basement. Donna Ashwell remembered that the fight occurred just a day or two before the two bodies were found in Rockford Park. The women recalled hearing the voices of Luis Cabrera and [Petitioner] during the fight. They also heard the voice of a third person, which they did not recognize.

At trial, both Ashwell and Skjefte testified. Ashwell recalled that on a Saturday night in January 1996, she heard what she described as a fight in the basement of her building. Ashwell also heard an argument. One voice, which sounded like that of Cabrera, asked another person a question. After a negative response to the question, Ashwell heard a metal crashing noise. Ashwell then went to the basement and banged on the door. [Petitioner] came to the door and Ashwell said to him, "Take the fight elsewhere or I'll call the police." [Petitioner] asked her not to do that and told her they would take the fight elsewhere.

Skjefte testified that she went down to the basement shortly after Ashwell did. She stated that Cabrera answered the door and told her they were taking care of some business. Skjefte also heard [Petitioner's] voice. Shortly thereafter, Cabrera came into the first floor foyer. He apologized to the women and said they were leaving.

Several items of physical evidence linked Rowe and Saunders to Cabrera, albeit indirectly. The first item was a watch that Rowe was wearing at the time of his death. That watch had a memory bank of phone numbers, one of which was for a woman. That telephone number was for the Wilmington residence of Luis Cabrera's father, Luis Cabrera, Sr. The second item of evidence was an ISS Servicesystem, Inc. business card found at the Saunders family home. On it was written a telephone number and the words "Big Lou." Both Cabrera and [Petitioner] worked at ISS and were known as "Big Louie" and "Little Louie."

On February 3, 1996, shortly after the murders, Cabrera returned Saunders' pager to a Page One store in Wilmington. The pager was identified as Saunders' by a code number inside it. Page One does not generally give receipts for returned pagers, however, when Cabrera returned Saunders' pager, he also bought a new one,

3

generating a receipt. Cabrera's name and address appear on the back of the receipt.

Cabrera's estranged wife testified for the State at [Petitioner's] trial. She stated that they had both worked for a cleaning service that was located on Silverside Road. The business card with "Big Lou" on it found in Saunders' bedroom had a Silverside Road address. Cabrera's wife also testified that she had owned a set of bed sheets that were similar to the single maroon sheet that was found covering the victim's bodies. When she separated from Cabrera, she left the maroon sheets behind for Cabrera. When police searched Mr. Cabrera Sr.'s house, they found a maroon sheet on the floor in a pile of laundry. Mr. Cabrera Sr. said it was his son's sheet. Both the sheet found during the search and the one covering the bodies had nearly identical labels.

Another inmate at the Gander Hill prison, Waymond Wright, testified [Petitioner] told him that he had gone to school with Saunders and Rowe. Wright testified that [Petitioner] told him that after the murder several classmates hugged [Petitioner]. Commenting on this, [Petitioner] told Wright, "if they only knew." Wright also testified that when [Petitioner] admitted to the murders, he said the victims were "short" on a pound of marijuana. Wright's testimony about [Petitioner's] account of how the murders were committed was similar to the events attributed to [Petitioner] by Sterling's testimony.

*Reyes v. State*, 819 A.2d 305, 308-10 (Del. 2003), *overruled by Rauf v. State*, 145 A.3d 430

(Del. 2016).

In October 2001, a Delaware Superior Court jury convicted Petitioner on two counts of first

degree murder and related offenses, and recommended a sentence of death by a vote of 9-3. (D.I.

14 at 1) In March 2002, the Superior Court sentenced Petitioner to death. (*Id.*) Petitioner appealed,

and the Delaware Supreme Court affirmed Petitioner's convictions and sentences on March 25,

2003. *See Reyes*, 819 A.2d at 318.

In March 2004, Petitioner filed a motion for post-conviction relief pursuant to Delaware

Superior Court Criminal Rule 61 ("Rule 61 motion"). After extensive briefing, depositions, the

retirement of the judge who presided over the trial and Rule 61 proceeding, and an evidentiary

hearing, the Superior Court granted the Rule 61 motion on January 27, 2016. *See State v. Reyes*, 2016 WL 358613 (Del. Super. Ct. Jan. 27, 2016), *rev'd by State v. Reyes*, 155 A.3d 331 (Del. 2017). The State appealed. On January 19, 2017, the Delaware Supreme Court reversed the Superior Court's judgment and reinstated Petitioner's convictions but determined that Petitioner's death sentence should remain vacated under *Rauf v. State*, 145 A.3d 430 (Del. 2016) and *Powell v. State*, 2016 WL 7243546 (Del. Dec. 15, 2016). *See Reyes*, 155 A.3d at 357. The Delaware Supreme Court remanded Petitioner's case to the Superior Court for resentencing on the two murder convictions, stating that the "Superior Court shall impose on each of the murder convictions a sentence of imprisonment for the remainder of [Petitioner's] natural life without the benefit of probation or parole or any other reduction." *Id.* The Superior Court resentenced Petitioner on July 7, 2017, as directed by the Delaware Supreme Court. (D.I. 14 at 3)

## III.    STANDARD OF REVIEW

If a state's highest court adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d). Pursuant to 28 U.S.C. § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial. 28 U.S.C. § 2254(d)(1) & (2); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). A claim has been "adjudicated on the merits" for the purposes of 28 U.S.C. § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground. *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009). The deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by

5

an opinion explaining the reasons relief has been denied." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). As explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

Finally, when reviewing a habeas claim, a federal court must presume that the state court's determinations of factual issues are correct. *See* 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## IV.   DISCUSSION

Petitioner timely filed the § 2254 Petition presently pending before the Court. (D.I. 3) Instead of identifying his grounds for relief on the form petition, Petitioner attached to the Petition the "Brief Following Evidentiary Hearing" ("Brief") dated April 30, 2014, and the "Supplemental Brief" dated August 24, 2015, that he had filed in the Superior Court in his Rule 61 proceeding. The Brief includes claims concerning the penalty phase of Petitioner's trial: Claims II (D.I. 3 at 87-180), III (D.I. 3 at 181-211), IV (D.I. 3 at 212-19), V (D.I. 3 at 220-33), VII (D.I. 3 at 242-58), VIII (D.I. 3 at 259-63), and IX (D.I. 3 at 264-69). Those claims, however, are moot, since Petitioner is no longer subject to the death penalty.

Given these circumstances, the Court will address the remaining claims in the Brief (Claims I, VI, X, and XI) and the Claim in the Supplemental Brief, now identified and renumbered as the following five Claims: (1) defense counsel provided ineffective assistance by failing to adequately

6

assist Petitioner in his decision whether to testify at trial; (2) defense counsel provided ineffective

assistance by failing to adequately cross-examine or otherwise discredit the State's witness, Roderick

Sterling; (3) defense counsel provided ineffective assistance by failing to prevent the State from

presenting a portion of Petitioner's testimony from another trial in its case-in-chief; (4) defense

counsel provided ineffective assistance by failing to present Luis Cabrera as a defense witness; and

(5) defense counsel's ineffective assistance, combined with the State's errors, cumulatively caused

Petitioner prejudice.  In addition, Petitioner presents two sub-arguments as part of Claim Two: that

the State violated its discovery obligations, by failing to provide the letter Sterling sent to his own

attorney about the case, and that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to

disclose Sterling's substance abuse issues.

Petitioner presented all of the aforementioned Claims to the Delaware Supreme Court on

post-conviction appeal.  The Delaware Supreme Court denied Claims One, Two, Four, and Five as

meritless.  Therefore, the Court must review these four Claims under § 2254(d), and habeas relief

will only be warranted if the Delaware Supreme Court's denial of the Clams was either contrary to,

or an unreasonable application of, clearly established federal law, or was based on an unreasonable

determination of the facts.

In contrast, the Delaware Supreme Court denied Claim Three as procedurally barred by

Delaware Supreme Court Criminal Rule 61(i)(4) based on having been previously adjudicated on

direct appeal.  *See Reyes*, 155 A.3d at 346.  The State asserts that the Court should review Claim

Three *de novo* rather than treat it as procedurally barred from habeas review, explaining that the

Delaware Supreme Court did not address the entire substance of Claim Three despite Petitioner's

fair presentation of the argument.  (D.I. 14 at 22-23)  For the reasons asserted by the State, the

Court will review Claim Three *de novo*.

7

### A. Claims One, Two, and Four: Ineffective Assistance of Defense Counsel

The Supreme Court precedent governing ineffective assistance of counsel claims is the two-pronged standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. 466 U.S. at 688. Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Under the second *Strickland* prong, a petitioner must demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* In order to sustain an ineffective assistance of counsel claim, a petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal. *See Wells v. Petsock*, 941 F.2d 253, 259-60 (3d Cir. 1991); *Dooley v. Petsock*, 816 F.2d 885, 891-92 (3d Cir. 1987).

A court can choose to address the prejudice prong before the deficient performance prong, and reject an ineffective assistance of counsel claim solely on the ground that the defendant was not prejudiced. *See Strickland*, 466 U.S. at 698. If the state court only addresses one prong of the *Strickland* test without addressing the merits of the other prong, and the federal court decides to consider the unaddressed prong, the federal court's review of the unaddressed prong must be *de novo*. *See, e.g., Porter v. McCollum*, 558 U.S. 30, 39 (2009) ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's Strickland claim *de novo*."); *Rompilla*

8

*v. Beard*, 545 U.S. 374, 390 (2005) (applying *de novo* review where state courts did not reach prejudice prong under *Strickland*).

Turning to the instant § 2254(d)(1) inquiry, a "state court decision is contrary to clearly established federal law if it applies a rule that contradicts the governing law set forth in Supreme Court precedent, or if it confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from that reached by the Supreme Court." *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). Since the Delaware Supreme Court correctly identified the *Strickland* standard in Petitioner's case, the Delaware Supreme Court's denial of Claims One, Two, and Four was not contrary to clearly established federal law. *See Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause.").

The Court's inquiry is not over, however, because it must also determine if the Delaware Supreme Court reasonably applied the *Strickland* standard to the facts of Petitioner's case. When performing this second step of the § 2254(d)(1) inquiry, the Court must review the Delaware Supreme Court's denial of Petitioner's ineffective assistance of counsel claims through a "doubly deferential" lens.[2] *See Harrington v. Richter*, 562 U.S. 86, 105 (2011). Notably, when § 2254(d)(1)

---

[2]As explained by the *Richter* Court,

> [t]he standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).

562 U.S. at 105 (internal citations omitted). The Supreme Court has indicated, but has not explicitly stated, that the doubly deferential standard applies to both prongs of a *Strickland* claim. *See, e.g.,*

9

applies, "the question is not whether counsel's actions were reasonable, [but rather], whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* When assessing prejudice under *Strickland*, the question is "whether it is reasonably likely the result would have been different" but for counsel's performance, and the "likelihood of a different result must be substantial, not just conceivable." *Id.* Finally, when viewing a state court's determination that a *Strickland* claim lacks merit through the lens of § 2254(d), federal habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 101.

The Court will review Claims One, Two, and Four under the "reasonable application" prong of 2254(d)(1) *in seriatim.*

### 1. Claim One: Ineffective assistance with respect to Petitioner's decision to testify

In Claim One, Petitioner contends that defense counsel were ineffective for not moving *in limine* to obtain a ruling that Petitioner's Otero conviction was not admissible for impeachment purposes under Delaware Rule of Evidence ("DRE") 609(a)(1). According to Petitioner, such a ruling would have aided him in deciding whether or not to testify in his own trial. *See Reyes*, 155 A.3d at 343.

The Delaware Supreme Court denied Claim One after determining that Petitioner did not establish that he was prejudiced by defense counsel's failure to file a motion *in limine.* First, the Delaware Supreme Court held that Petitioner's "election not to testify was a knowing, intelligent and

---

*Cullen v. Pinholster*, 563 U.S. 170, 202 (2011); *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). While at least two circuit courts have explicitly held that the "doubly deferential" standard applies to both *Strickland* prongs, "it is an open question in [the Third Circuit] whether [the doubly deferential] language applies to the prejudice prong [of *Strickland*]." *Lazar v. Sup't Fayette SCI*, 731 F. App'x 119, 122 n.4 (3d Cir. 2018). Since the Parties did not specifically brief this issue, and since the Court's decision regarding the ineffective assistance of counsel claims is warranted under the traditional AEDPA deference, the Court will not address whether "double deference" applies to both prongs of the *Strickland* standard.

voluntary decision," as demonstrated by the trial court's careful and thorough colloquy with Petitioner about his right to testify. *Id.* at 343. Then, the Delaware Supreme Court explained how Petitioner could not demonstrate a reasonable probability that the result of his trial would have been different if defense counsel had filed a motion *in limine*, because the effect of such a motion on Petitioner's trial was only speculative. *See Reyes*, 155 A.3d at 344. For instance, since Delaware trial courts are not obligated to rule on a motion *in limine* before the defendant testifies, the trial court in Petitioner's case could have deferred ruling on the motion until after Petitioner testified. *See Reyes*, 155 A.3d at 344 ("[T]he manner in which the trial court would have addressed such a motion involves speculation."). The Delaware Supreme Court discussed how DRE 609(a)(1) requires a court to weigh the probative value of a prior conviction against the prejudicial effect to the defendant when deciding whether to permit impeachment by evidence of a criminal conviction. Significantly, "[t]o perform this balancing act, the court must know the precise nature of the defendant's testimony, which is unknowable until he actually testifies." *Reyes*, 155 A.3d at 344.

The Delaware Supreme Court also described how, "[e]ven if the trial court had granted a motion *in limine* prior to Petitioner's testimony, the ruling would have been subject to change as the evidence unfolded." *Id.* Since Petitioner was serving a sentence for second degree murder arising from the Otero murder, a murder in which Cabrera was also involved, Petitioner would have been subject to vigorous cross-examination concerning his relationship with Cabrera. *See id.* at 344. Consequently, "[w]hether he might have given answer that rendered the Otero murder admissible for impeachment or another relevant purpose is speculation." *Id.*

In short, the Delaware Supreme Court concluded that both the timing of the trial court's ruling on the motion and the possible effect of that ruling on Petitioner's decision to testify were pure speculation. *See Reyes*, 155 A.3d at 344. The Delaware Supreme Court did not unreasonably

11

apply clearly established federal law by focusing on the speculative effect a motion *in limine* would have had when assessing whether Petitioner was prejudiced by counsel's failure to file such a motion. The Supreme Court has long recognized the speculative nature of motions *in limine*, opining

> a ruling [*in limine*] is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the proffer. Indeed, even if nothing unexpected happens at trial, the . . . judge is free, in the exercise of sound discretion, to alter a previous *in limine* ruling.

*Luce v. United States*, 469 U.S. 38, 41 (1984). Given Petitioner's inability to predict the timing of the trial court's ruling on a motion *in limine* and the actual evidentiary effect arising from the trial court granting such a motion, Petitioner cannot demonstrate a reasonable probability that his decision to forego testifying would have been different but for defense counsel's failure to file a motion *in limine*. Accordingly, the Court will deny Claim One because Petitioner has failed to satisfy § 2254(d)(1).

### 2. Claim Two: Ineffective assistance with respect to Roderick Sterling's testimony

In Claim Two, Petitioner alleges that defense counsel were ineffective in their handling of the State's witness Sterling because they failed to: (1) have Galindez testify and rebut Sterling's assertion that, while he was incarcerated with Petitioner, Sterling overheard Petitioner tell Galindez that Petitioner committed the Rockford Park Murders with Cabrera; (2) ask for a missing evidence instruction regarding the letter Sterling wrote to his attorney stating that he had information about the murders ("Sterling Letter"); and (3) pursue information about Sterling's drug history.

The following excerpt from the Delaware Supreme Court's decision on post-conviction appeal provides relevant background information for Claim Two.

> Roderick Sterling was an important witness against [Petitioner]. . . . Sterling, an inmate at Gander Hill prison, overheard [Petitioner] admit to another inmate, Ivan Galindez, that he, [Petitioner], was involved in the Rockford Park Murders.

12

At the time he overheard [Petitioner] speaking with Galindez, Sterling was awaiting trial on two counts of Unlawful Sexual Intercourse in the First Degree. The victim was his seven year old niece. In June 1997, he notified his attorney by letter that he had information about the Rockford Park Murders. On December 1, 1988, Sterling pled guilty to one count of Unlawful Sexual Intercourse in the Second Degree and was sentenced to twenty years at Level V, suspended after ten years, followed by ten years of community probation. After Sterling testified at [Petitioner's] trial, the State joined in a motion to withdraw his guilty plea to Unlawful Sexual Intercourse in the Second Degree. The motion was granted. Sterling then pled guilty to Unlawful Sexual Intercourse in the Third Degree. The State recommended a sentence of ten years at Level V, suspended immediately, with the expectation that Sterling would be deported to Jamaica. The recommended sentence was imposed and Sterling was deported. The Superior Court reasoned that Sterling had received a "huge benefit" for his testimony. It stated that "[t]he benefit offered to Sterling by the State in exchange for Sterling's testimony rendered Sterling's testimony unreliable."

Based upon an interview with Sterling conducted by an investigator in 2008 in Jamaica, [Petitioner] has contended in this postconviction proceeding that Sterling's testimony was actually hearsay. Specifically, he contends that Sterling did not overhear [Petitioner] speaking, and that his testimony was hearsay passed on to him by Galindez. . . .

        *                         *                         *

The interview with Sterling in 2008 was conducted as part of defense preparation during this postconviction proceeding. In the interview, Sterling said that Galindez gave him some details after Sterling overheard the conversation between [Petitioner] and Galindez. He stated that his testimony at trial was some of what he overheard [Petitioner] say and Galindez filled in to give a full explanation. Because of the time which had passed, Sterling did not remember much of the conversation he overheard in 1997. He said the detail of the motive for the killings came from Galindez.

After [Petitioner's] attorneys in the postconviction proceeding received the interview with Sterling, they moved for an order to take Sterling's deposition. In an opinion issued November 13, 2012, the trial judge denied the motion. [The judge] compared [Petitioner's] trial testimony and the statement which [Petitioner] had given to the

13

investigator during the 2008 interview. He explained his ruling as follows:

> The Court sees an insufficient basis to authorize Sterling's deposition. First, he professed lack of memory on some things eleven years after the date he overheard [Petitioner] speak to Galindez. Second, while he identified one area – the motive, which he said Galindez gave some detail, that was the one identified. There were a series of details he recited in his 1998 statement and at trial and no basis has been presented to believe those were not things he actually overheard. Third, Sterling did not recant his trial testimony or the 1998 statement. Fourth, a careful reading of the 2008 statement simply makes no compelling case or cause to take his deposition. No glaring changes or inconsistencies appear, and he made no statement that what he said at trial was not truthful.

> [Petitioner's] attorneys filed a motion for reargument, in which they argued, among other things, that they should be permitted to take Sterling's deposition to develop potential claims, including Due Process violations. The trial judge denied the motion for reargument.

> &ast;                              &ast;                              &ast;

> By denying [Petitioner's motion to take Sterling's deposition and denying the motion for reargument, in which [Petitioner] argued that Sterling's testimony was hearsay passed on from Galindez and that a deposition was necessary to develop potential Due Process claims, the trial court rejected [Petitioner's] hearsay and Sixth Amendment challenges. That ruling forms the law of the case regarding Sterling's testimony unless the ruling is "clearly wrong, produced an injustice or should be revisited because of changed circumstances." The 2012 ruling is not clearly wrong and no circumstances have changed since the ruling was issued. Furthermore, whether the benefit offered to Sterling by the State in exchange for his testimony rendered his testimony unreliable was for the jury to decide.

*Reyes*, 155 A.3d at 348-51.

The judge who presided over both the trial and Rule 61 proceeding retired while the Rule 61 proceeding was still pending, and the case was reassigned to a successor judge. After considering

14

Petitioner's allegation that defense counsel were ineffective in how they treated Sterling's testimony, the successor judge ruled that defense counsel had provided ineffective assistance in all three instances set forth in Claim Two.  On post-conviction appeal, the Delaware Supreme Court held that defense counsel had not provided ineffective assistance in the manner alleged by Petitioner, and reversed the Superior Court's judgment.  For the reasons set forth below, the Court concludes that the Delaware Supreme Court did not unreasonably apply *Strickland* when denying all three sub-arguments of Claim Two.

> **a. Defense counsel's failure to call Galindez as a witness to rebut Sterling's assertion that he overheard a conversation between Petitioner and Galindez during which Petitioner admitted his role in the Rockford Park Murders**

Petitioner contends that defense counsel should have called Galindez as a witness to rebut Sterling's testimony that he overheard Petitioner tell Galindez that he (Petitioner) participated in the Rockford Park murders.  According to Petitioner, if Galindez had testified, he would have confirmed Sterling could not have overheard a conversation between Petitioner and Galindez because, at that time, Galindez and Petitioner mostly spoke Spanish, a language that Sterling did not understand.  Petitioner summarizes the argument as follows:

> Prior postconviction counsel's investigation also revealed that Ivan Galindez spoke very little, if any, English during this period. Galindez also stated that Sterling did not speak Spanish, and therefore, the two could not have discussed anything pertinent to [Petitioner] even if they wanted to.

(D.I. 3 at 70-73)

During the Rule 61 proceeding, the State responded to Petitioner's argument as follows:

> [Petitioner] also fails to support his claim that any conversation he might have had with Galindez was in Spanish, and therefore Sterling would not have understood it.  The record is replete with references to the fact that [Petitioner] did not speak Spanish fluently.

15

(D.I. 17-15 at 305)

The importance of Petitioner's limited ability to speak Spanish when Sterling overheard the

conversation between Galindez and Petitioner is best demonstrated by the following excerpt from

the Superior Court's Rule 61 decision:

> Sterling claimed that Sterling overheard and understood
> conversations between [Petitioner] and Galindez. However, if
> Galindez had testified, Galindez would have demonstrated that
> Sterling's claim was false because Sterling could not possibly have
> understood any conversation between Galindez and [Petitioner]. At
> trial, Sterling testified that he did not speak Spanish and only
> understood Spanish "a little bit." Sterling further testified that he
> heard the conversation between Galindez and [Petitioner] in English.
> However, in a 2012 affidavit, Galindez provided:
>
>> [ ] While I was serving my sentence [at Gander Hill], I
>> was on the same pod as [Petitioner]. [ ] [Petitioner]
>> and I talked about a lot of things while we were on
>> the same pod. [ ] When I spoke to [Petitioner], I
>> spoke to him in Spanish because at the time, I spoke
>> very little English. [ ] At the time, my cell [mate] was
>> Roderick Sterling. [ ] Roderick Sterling did not speak
>> Spanish.

*Reyes*, 155 A.3d at 356.

The Delaware Supreme Court rejected Claim Two (a) after reviewing the trial record,

holding that "the evidence does not establish that [Petitioner's] trial attorneys were objectively

unreasonable in not calling Galindez as a witness." *Reyes*, 155 A.3d at 356. The Delaware Supreme

Court explained that "the record clearly establishes that at the time of the trial, [Petitioner's] trial

attorneys reasonably believed that he did not speak Spanish." *Id.*

The record supports the Delaware Supreme Court's explicit factual determination that

Petitioner did not speak Spanish fluently and that he was limited in his ability to communicate in

Spanish. For instance, at Cabrera's trial for the murder of Otero, Petitioner testified that he

16

(Petitioner) only understood "a little bit" of Spanish. *Reyes*, 155 A.3d at 356. At Petitioner's Rule 61

evidentiary hearings in the Superior Court, Petitioner's Aunt, Luz Diaz, testified as follows:

> [W]e speak English to him. He tried to speak to my mom in Spanish,
> you know, broken Spanish. But, you know, he don't speak very good
> Spanish. We always kid him. English please.

*Reyes*, 155 A.3d at 357. Finally, during the Rule 61 evidentiary hearing, both of Petitioner's defense

counsel testified that, according to their recollection, Petitioner was not fluent in Spanish and

actually had minimal ability to converse in Spanish. *See Reyes*, 155 A.3d at 356.

Significantly, Petitioner has not provided any evidence in this proceeding to contradict the

Delaware Supreme Court's factual determination that Petitioner spoke very little, if any, Spanish at

the time of his conversation with Galindez. As a result, the Court accepts as correct the Delaware

Supreme Court's determination that "the admissible evidence" demonstrating Petitioner's lack of

fluency in Spanish was more relevant than Galindez's "untested affidavit written eleven years after

trial." *Id.* at 356.

In sum, the record evidence of Petitioner's lack of fluency in Spanish casts doubt on

Petitioner's contention that calling Galindez as a witness would have helped to cast doubt on the

credibility of Sterling's testimony concerning Petitioner's confession to Galindez about his

participation in the Rockford Park Murders. Additionally, since Petitioner confessed to Galindez

about participating in the Rockford Park Murders, there was the very real possibility that calling

Galindez to testify about the conversation may have backfired. Notably, Petitioner does not address

this danger. For these reasons, the Court concludes that the Delaware Supreme Court reasonably

determined the facts and reasonably applied *Strickland* in holding that defense counsel did not

perform deficiently by not calling Galindez as a witness during Petitioner's trial. Accordingly, the

Court will deny Claim Two (a) for failing to satisfy § 2254(d).

17

**b.  Defense counsel's failure to request a missing evidence instruction or assert a *Brady v. Maryland* argument regarding the State's failure to provide the Sterling Letter as evidence**

Next, Petitioner contends that defense counsel were ineffective for not requesting a missing evidence instruction, and not asserting that the State violated its discovery obligations under *Brady v. Maryland*, given that the State did not introduce the Sterling Letter into evidence at trial and the whereabouts of the original letter were unknown.  The following excerpt from the Delaware Supreme Court's postconviction appellate decision provides relevant background information.

> Sterling first surfaced as claiming to have knowledge of the Rockford Park Murders in a letter which he wrote to his attorney ("the Sterling letter").  At [Petitioner's] trial, Sterling said the letter was written by Galindez but signed by him, Sterling.
>
> *             *             *
>
> The "Sterling Letter" was not introduced into evidence at trial.  The whereabouts of the original are unknown.  The contents of the letter are, however, preserved in a verbatim recitation thereof contained in a police report.  The letter read as follows:
>
>> I am writing this letter to inform you of some information regarding two bodies found at Rockford Park.  The victims were shot, I believe the case is unsolved.  Me and my roommate heard a conversation about that — . . . check about that.  Check out the DA to see if we can make deal.  That a visit a letter to notify.
>
> The letter itself seems to have little probative value.
>
> At trial, Reyes' trial attorneys did raise a hearsay objection to Sterling's testimony when Sterling testified that Galindez wrote the letter and he, Sterling, signed it.  The trial court overruled the objection on the grounds that Sterling adopted its contents by signing it.

*Reyes*, 155 A.3d at 351-52.

18

In *Brady v. Maryland*, the Supreme Court held that prosecutors cannot suppress evidence favorable to a defendant if that evidence is material either to guilt or to punishment. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). In order to prevail on a *Brady v. Maryland* claim, a petitioner must establish that: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or it had impeachment value; (2) the prosecution suppressed the evidence, "either willfully or inadvertently;" and (3) the evidence was material. *See Strickler*, 527 U.S. at 281-82; *Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004).

In turn, pursuant to Delaware law, a "missing evidence instruction . . . requires the jury [to] infer that, had the evidence been preserved, it would have been exculpatory to the defendant." *McCrey v. State*, 941 A.2d 1019 (Table), 2008 WL 187947, at *2 (Del. 2008).

> [When] reviewing a claim that the State failed to preserve potentially exculpatory evidence, [a court] must consider: (i) whether the requested material, if in the possession of the State at the time of the request, would have been subject to disclosure under Superior Court Criminal Rule 16 or under *Brady v. Maryland*; (ii) if so, whether the State had a duty to preserve the material; and (iii) if there was a duty to preserve, whether the State breached that duty and what consequences should flow from that breach. Those consequences are determined in accordance with a three-part test, which considers: [(i)] the degree of negligence or bad faith involved; [(ii)] the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and [(iii)] the sufficiency of the other evidence produced at the trial to sustain the conviction.

*Id.*

Here, the Delaware Supreme Court rejected Petitioner's contention that defense counsel provided ineffective assistance by not asserting a *Brady v. Maryland* violation or requesting a missing evidence instruction concerning the Sterling Letter, because he failed to demonstrate that he was prejudiced by the loss or absence of the Sterling Letter. *See Reyes*, 155 A.3d at 355. Specifically, the Delaware Supreme Court opined:

19

> There is no finding, nor, apparently, any evidence of negligence or bad faith on the part of the State. As mentioned, the contents of the letter did not seem to have significant probative value. Although the original of the letter is lost, its contents are known. Under these circumstances, there is no proper basis for giving a missing evidence instruction. Therefore, [Petitioner] failed to establish prejudice from the loss of the "Sterling Letter," and the Superior Court's ruling that his trial attorneys were ineffective in not requesting a missing evidence instruction is error.

*Reyes*, 155 A.3d at 355.

In this proceeding, Petitioner has not provided any evidence to rebut the Delaware Supreme Court's conclusion that the State did not violate its discovery obligations under *Brady v. Maryland* or its conclusion that a missing evidence instruction was not warranted. Additionally, the Court has reviewed the record and has not found any reason to question the Delaware Supreme Court's underlying factual determination that there was no evidence that the State lost, destroyed, or suppressed the Sterling Letter. Since a police report recited the contents of the Sterling Letter verbatim, the Delaware Supreme Court properly determined that there was no basis for giving a missing evidence instruction. Relatedly, since the verbatim recitation also demonstrated that the Sterling Letter had little probative value, the Sterling Letter did not constitute material exculpatory or impeachment evidence for *Brady v. Maryland* purposes. Given these circumstances, Petitioner failed to demonstrate a reasonable probability that the result of his trial would have been different but for defense counsel's failure to pursue a missing evidence instruction or assert a *Brady v. Maryland* violation relating to the Sterling Letter. Accordingly, the Court will deny Claim Two (b) for failing to satisfy § 2254(d).

20

### c. Defense counsel's failure to highlight Sterling's battle with substance abuse

In Claim Two (c), Petitioner contends that the State committed a *Brady v. Maryland* violation by failing to detail Sterling's personal battle with substance abuse, and that defense counsel were ineffective for failing to pursue this information through a more rigorous cross-examination of Sterling. According to Petitioner, Sterling's issues with substance abuse could have been used as impeachment evidence to cast doubt on Sterling's credibility, which was "all the more important" because of the role his testimony played in Petitioner's trial. (D.I. 17-15 at 84) More specifically, Petitioner contends:

> However, even with full access to Sterling's criminal history, which included extensive battles with reported substance abuse, the State did not provide any information to trial information to trial counsel detailing Sterling's drug use or treatment. Indeed, Sterling claimed that alcohol and drugs were a factor in his Unlawful Sexual Contact case; so much so that he claimed he did not remember the incident. As such, it is clear that Sterling battled substance abuse issues, which trial counsel should have been permitted to explore on cross-examination.

> \*                              \*                              \*

> Given Sterling's importance as a witness for the State, had the State properly provided a detailed history of Sterling's prior and current drug use, it is reasonably likely that trial counsel's cross-examination and impeachment of Sterling would have put the whole case in a different light. Sterling was the only witness tying [Petitioner] to these murders, and therefore, his impeachment would have a dramatic effect.

(D.I. 17-15 at 84-85)

On post-conviction appeal, the Delaware Supreme Court denied the underlying *Brady v. Maryland* argument and the instant ineffective assistance of counsel argument in Claim Two (c) because Petitioner failed to establish prejudice. For the following reasons, the Court concludes that

21

the Delaware Supreme Court reasonably applied *Brady v. Maryland* and *Strickland* in reaching its

decision.

In his Rule 61 proceeding, Petitioner argued that the State was required to provide

information garnered from the trial court's confidential presentence investigation prepared in

relation to Sterling's rape case, as well as comments Sterling made when he was sentenced on his

rape conviction that he needed some sort of drug rehabilitation program. The Delaware Supreme

Court rejected this argument and explained that defense counsel's cross-examination of Sterling

provided sufficient information about Sterling's substance abuse problems, opining:

> The jury was made well aware that Sterling had been convicted of
> committing Unlawful Sexual Intercourse in the Second Degree upon
> his seven year old niece. The jury was also made aware that, in
> exchange for his testimony, Sterling had an agreement with the State
> that would result in the suspension of the balance of a ten year Level
> V term and allow for his immediate release and deportation to
> Jamaica. The jury was therefore aware that Sterling received a very
> substantial benefit from the State for his testimony. On cross-
> examination, trial counsel also elicited from Sterling that he had been
> a drug dealer and had used "weed."

*Reyes*, 155 A.3d at 354. The Delaware Supreme Court concluded that:

> Given the significant impeachment evidence which was presented
> concerning Sterling's conviction, the benefit he was receiving from
> the State in exchange for his testimony, and his drug dealing and drug
> use, we think it unlikely that more vigorous cross examination about
> drug and alcohol abuse would have led to a different result. We
> conclude that [Petitioner] failed to establish prejudice in connection
> with impeachment of Sterling. The Superior Court erred in finding a
> *Brady* violation. Since we find that [Petitioner] failed to establish
> prejudice, it unnecessary to address the first and second elements of
> *Brady*. This finding on our part also disposes of [Petitioner's] claim
> that trial counsel was ineffective in not specifically asking for drug
> and alcohol impeachment evidence pertaining to Sterling.

*Id.* at 354-55.

22

Petitioner does not identify the information in Sterling's presentence report from his rape conviction that would have constituted material impeachment or exculpatory *Brady v. Maryland* material or, alternatively, would have enabled defense counsel to conduct a more thorough cross-examination of Sterling in Petitioner's trial. Petitioner also does not identify what information defense counsel could have garnered through a more rigorous cross-examination that would have created a reasonable probability of a different result. In contrast, the record supports the Delaware Supreme Court's conclusion that defense counsel effectively cross-examined Sterling on his prior conviction for raping a small child, that he both sold and used drugs, about his ability to overhear the conversation between Petitioner and Galindez, and his impetus for testifying, including that his sentence would be reduced after his testimony and that he would be deported but no longer imprisoned. Thus, the Court concludes that the Delaware Supreme Court reasonably applied *Brady v. Maryland* and *Strickland* in concluding that Petitioner failed to demonstrate the requisite prejudice needed to succeed on either argument. Accordingly, the Court will deny Claim Two (c) for failing to satisfy § 2254(d).

### 3. Claim Four: Ineffective assistance with respect to co-defendant Luis Cabrera's statements

In Claim Four, Petitioner argues that defense counsel were ineffective for failing to offer into evidence the alleged "exculpatory" statement his co-defendant Luis Cabrera provided to counsel when they interviewed him; the statement identified somebody other than Petitioner as the person who committed the Rockford Park Murders. According to Petitioner, even if Cabrera would have been unavailable as a witness, his statement could have been admitted at Petitioner's trial under the "statement against interest" exception to the hearsay rule set forth in DRE 804(b)(3). Cabrera's trial in the Rockford Park Murders took place before Petitioner's trial and he was convicted of all

23

charges. *See Reyes*, 155 A.3d at 346. Cabrera did not testify at Reyes' trial and both Reyes and

Cabrera were sentenced on the same day, March 14, 2002. *Id.*

The following factual summary is relevant to the issue presented here. "There had

apparently been some talk of Cabrera testifying at Petitioner's trial." *Reyes*, 155 A.3d at 346.

Cabrera's attorney wrote a letter to Cabrera dated March 6, 2001, stating, in part:

> I agree with your decision. I know that you genuinely wish to assist
> [Petitioner] in his trial, however, I think that any testimony you give
> at this point will seriously undermine your chances of success in your
> appeal, or during any other Postconviction action.
>
> Notwithstanding your decision not to testify, [Petitioner's defense
> attorneys] would like the opportunity to speak with you so you can
> focus their efforts in defending [Petitioner]. I personally see no
> downside to this type of communication. . . . Based upon your very
> clear desire not to testify, however, I have to insist that [defense
> counsel] keep this discussion "off the record." Essentially this means
> that anything you say to them will be used for trial preparation for
> the [Petitioner's] trial, but you will not be asked to testify as to any
> matters given during this conversation.

*Id.*

A meeting between Cabrera and one of Petitioner's defense counsel did take place, with an

investigator present. *See id.* at 347. At that time, Cabrera said that Saunders and Rowe were

murdered by a person named Neil Walker and that Petitioner was not involved. *Id.* Defense

counsel and their investigator took notes of Cabrera's account. *Id.*

Cabrera then wrote a letter to one of Petitioner's counsel on September 23, 2001, saying that

he had been approached by Petitioner's mother and that he did "want to help," but not at the

expense of admitting his own guilt. *Id.* On October 9, 2001, after Petitioner's trial had already

started, Cabrera's attorney wrote a letter to Petitioner's counsel which stated, in pertinent part:

> I understand my client may have communicated a willingness and
> desire to testify on behalf of [Petitioner].

24

> Notwithstanding these prior communications, my client indicated to
> me that he did not wish to appear as a witness in the [Petitioner's]
> trial.   Moreover, if Mr. Cabrera was called as a witness in
> [Petitioner's] trial, he would refuse to testify based upon his counsel's
> advice and based upon his assertion of his Fifth Amendment
> privileges.

*Id.*

On August 29, 2012, at the postconviction evidentiary hearing, Petitioner's counsel called

Cabrera as a witness. *Id.* Citing "upcoming hearings of my own," Cabrera refused to answer

questions, invoking his Fifth Amendment privilege. *Id.*

On post-conviction appeal, the Delaware Supreme Court rejected Petitioner's instant

contention that defense counsel provided ineffective assistance by failing to offer Cabrera's

statement that the murders were committed by Neil Walker. After reviewing the statement under

DRE 804(b)(3), the Delaware Supreme Court concluded that Cabrera's statement constituted

inadmissible hearsay, thereby precluding Petitioner from demonstrating he was prejudiced by his

defense counsel's failure to offer Cabrera's statement into evidence. More specifically, the Delaware

Supreme Court opined:

> [DRE  804(b)(3)]  allows  statements  against  interest  made  by  an
> unavailable witness to be admitted under some circumstances. One
> element for admissibility is that the statement must be one which "so
> far tended to subject the declarant to civil or criminal liability . . . that
> a reasonable person in the declarant's position would not have made
> the statement unless the declarant believed it to be true." Where the
> statement is one "tending to expose the declarant to criminal liability
> and offered to exculpate the accused," the statement is "not
> admissible unless corroborating circumstances clearly indicate the
> trustworthiness of the statement." The extent to which Cabrera's
> statement tended to expose him to criminal liability seems somewhat
> arguable.   To the extent that Cabrera's statement did not tend to
> expose him to criminal liability, it is not admissible under this rule.
> To the extent that it did tend to expose him to criminal liability, it
> would have been offered "to exculpate the accused," [Petitioner].

25

> Under these circumstances, Cabrera's statement was admissible only
> if "corroborating circumstances clearly indicate[d] the trustworthiness
> of the statement." [Petitioner] contends that there is some
> independent corroboration of Cabrera's claim, in that Cabrera was
> charged and indicted for physically assaulting Neil Walker in anger
> . . . . However, we do not regard this as corroboration of Cabrera's
> statement that Neil Walker was the killer. Cabrera's statement was
> not supported by any corroborating circumstances that clearly
> indicate the trustworthiness of the statement. Therefore, Cabrera's
> statement to [Petitioner's] trial attorneys was inadmissible hearsay.
> Accordingly, [Petitioner] cannot establish prejudice from his trial
> counsel's failure to offer Cabrera's statement into evidence. It was
> error for the Superior Court to find that [Petitioner's] trial counsel
> were ineffective for not attempting to introduce Cabrera's statement.

*Reyes*, 155 A.3d at 348.

After reviewing Claim Four in the context of the record, the Court concludes that the

Delaware Supreme Court's decision constituted a reasonable application of *Strickland*. First, on

habeas review, the Court defers to the Delaware Supreme Court's interpretation and application of

clearly established Delaware law, including evidentiary rules. *See Estelle v. McGuire*, 502 U.S. 62, 68

(1991). Second, given Petitioner's failure to provide clear and convincing evidence to the contrary,

the Court also accepts as correct the Delaware Supreme Court's factual determination that there

were no corroborating circumstances clearly indicating the trustworthiness of Cabrera's statement.

Given the absence of corroborating circumstances, the Court defers to the Delaware Supreme

Court's conclusion that Cabrera's statement constituted inadmissible hearsay. Therefore, Petitioner

cannot show a reasonable probability that the outcome of his trial would have been different but for

defense counsels' failure to offer an inadmissible statement as evidence. Accordingly, the Court will

deny Claim Four for failing to satisfy § 2254(d).

**B. Claim Three: Ineffective Assistance**

In Claim Three, Petitioner contends that defense counsel provided ineffective assistance by

26

failing to properly object at trial to the admission of a specific portion of testimony from Cabrera's

1998 trial for the Otero homicide. Petitioner also contends that appellate counsel was ineffective for

failing to raise this issue on direct appeal. More specifically, Petitioner alleges that the relevant

portion of his testimony portrays him as a liar and violates DRE 404 because it was inadmissible

character evidence. (D.I. 3 at 234-35) The specific testimony at issue is set forth below:

> Q:     Okay. And you don't recall telling your girlfriend that or do
> you recall telling your girlfriend that you were with Luis and
> somebody came over to the house and you went down to the
> basement and beat them up?
>
> A:     No. I don't recall telling her that. Not that moment. I told
> her that another time.
>
> Q:     Another time?
>
> A:     Yes.
>
> Q:     When was that?
>
> A:     When we was at our house
>
> Q:     So you lied to your girlfriend when you were at your house?
>
> A:     Yes.
>
> Q:     And when was that?
>
> A:     I couldn't give you an exact date.

*Reyes*, 155 A.3d at 344.

As previously explained, the State asserts, and the Court concurs, that Claim Three must be

reviewed *de novo*. That said, the Court concludes that Petitioner's instant ineffective assistance of

counsel claim is meritless. The record reveals that defense counsel objected to the admission of the

entire excerpt of Petitioner's testimony from Otero's trial on the basis that it was irrelevant due to a

lack of context and also that it was prejudicial to their client. The objection included the statement

27

"So you lied to your girlfriend when you were at your house" and Petitioner's "Yes" answer. (A62-66)  A prolonged sidebar took place, during which defense counsel again argued that the statement was irrelevant and unfairly prejudicial. *See Reyes*, 155 A.3d at 345.  Defense counsel argued that there was nothing in Petitioner's reference to the beating in the basement linking the beating to the Rockford Park Murders. *Id.*  Once it became clear that the Superior Court was going to admit the evidence about the fight, defense counsel continued to object to the line of testimony in which Petitioner said he lied to his girlfriend. *Id.*  The State argued for admission of the lines in question as showing that Petitioner was unwilling to admit he was involved in a fight in the basement. *Id.*  The trial court ruled that the lines would be admitted, stating:

> Unless someone can show something to me otherwise, considering that the only thing Mr. Reyes says was something about a beating and did not mention any possible events thereafter, that's an inference that a jury can take from that particular series of questions and answers on page 118, lines13 through 17, that he lied to her by not telling her the whole thing.

*Reyes*, 155 A.3d at 345.

Given this record, the Court concludes that defense counsel acted reasonably by making an active attempt to preclude admission of Petitioner's testimony from the Otero case.  The fact that the trial judge ruled against defense counsel's objection does not demonstrate that defense counsel provided ineffective assistance.  Moreover, Petitioner has provided nothing to indicate that an objection on the basis that the testimony characterized Petitioner as a liar would have been successful.  Rather, as the Delaware Supreme Court noted on direct appeal, the record reflected that Petitioner's statements were corroborated by his girlfriend's independent statements to the police and supported the trial judge's determination that Petitioner's statement qualified as relevant evidence under DRE 403.

Petitioner also contends that appellate counsel provided ineffective assistance on direct appeal because they only argued that the beginning portion of the trial excerpt should have been excluded under the Delaware Rules of Evidence. Claims of ineffective assistance of appellate counsel are evaluated under the same *Strickland* standard applicable to trial counsel. *See Lewis v. Johnson*, 359 F.3d 646, 656 (3d Cir. 2004). An attorney's decision about which issues to raise on appeal is strategic,[1] and an attorney is not required to raise every possible non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745 (1983); *Smith v. Robbins*, 528 U.S. 259, 272 (2000). As a general rule, the presumption of effective assistance of appellate counsel will be overcome "only when ignored issues are clearly stronger than those presented." *Smith*, 528 U.S. at 285. In order to establish prejudice, a petitioner must show a reasonable likelihood that the court would have resolved the case differently on appeal, if not for counsel's deficiencies. *See United States v. Mannino*, 212 F.3d 835, 845 (3d Cir. 2000).

The Court does not agree with Petitioner that appellate counsel provided ineffective assistance. First, Petitioner has failed to overcome the presumption of effective assistance of appellate counsel. Second, given the record support for the trial court's ruling, Petitioner cannot demonstrate a reasonable probability that the result of his appeal would have been different but for appellate counsel's failure to challenge the admission of the entire trial excerpt from Otero's trial.

Accordingly, the Court will deny Claim Three in its entirety as meritless.

**Claim Five: Cumulative Error**

In his final Claim, Petitioner contends that the individual impact of each alleged error as well as the cumulative impact of alleged errors deprived him of a fair trial and therefore warrants federal

---

[1] *See Albrecht v. Horn*, 485 F.3d 103, 138 (3d Cir. 2007); *Buehl v. Vaughn*, 166 F.3d 163, 174 (3d Cir. 1999) (counsel is afforded reasonable selectivity in deciding which claims to raise without specter of being labeled ineffective).

habeas relief.  The United States Supreme Court has not recognized the concept of cumulative error

on habeas review.  *See Bush v. Carpenter*, 926 F.3d 644, 686 n.16 (10th Cir. 2019).

      The Third Circuit has recognized the cumulative error doctrine on habeas review, holding

that "a cumulative error argument constitutes a stand-alone constitutional claim subject to

exhaustion and procedural default." *Collins v. Sec'y of Pa. Dep't of Corr.* 742 F.3d 528, 542 (3d Cir.

2014).  Given the Third Circuit's recognition of the cumulative error doctrine in habeas proceedings,

the Court will exercise prudence and review Claim Five.

      Pursuant to the cumulative error doctrine,

> [i]ndividual errors that do not entitle a petitioner to relief may do so
> when combined, if cumulatively the prejudice resulting from them
> undermined the fundamental fairness of his trial and denied him his
> constitutional right to due process.  Cumulative errors are not
> harmless if they had a substantial and injurious effect or influence in
> determining the jury's verdict, which means that a habeas petitioner is
> not entitled to relief based on cumulative errors unless he can
> establish actual prejudice.

*Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008).

      Here, the Delaware Supreme Court reviewed and rejected each alleged underlying error on

its merits or as procedurally barred.  As previously discussed, this Court has also concluded that all

of the Claims lack merit and did not cause any prejudice.  Since Petitioner has not provided anything

to demonstrate "actual prejudice" even when all of the Claims are considered together, the Court

will deny Claim Five as meritless.

## V.        CERTIFICATE OF APPEALABILITY

      A district court issuing a final order denying a § 2254 petition must also decide whether to

issue a certificate of appealability.  *See* 3d Cir. L.A.R. 22.2 (2011); 28 U.S.C. § 2253(c)(2).  A

certificate of appealability is appropriate when a petitioner makes a "substantial showing of the

denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court has concluded that the instant Petition does not warrant relief. Reasonable jurists would not find this conclusion to be debatable. Accordingly, the Court will not issue a certificate of appealability.

## VI.    CONCLUSION

For the reasons discussed, the Court concludes that the Petition must be denied. An appropriate Order will be entered.

31